# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
### JACKSON DIVISION

**BRYANT CARTER**                                                          **PETITIONER**

**VERSUS**                           **CIVIL ACTION NO. 3:10CV95 WHB-LRA**

**STATE OF MISSISSIPPI**                                               **RESPONDENT**

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Bryant Carter was convicted in the Circuit Court of Pike County, Mississippi, and

seeks federal habeas relief under 28 U.S.C. § 2254. After a review of the entire record,

the undersigned recommends that his petition be dismissed with prejudice.

### Factual and Procedural Background

Carter was convicted of sexual battery of a child under the age of 14 in the Circuit

Court of Pike County, Mississippi. On February 5, 2007, he was sentenced to serve life

imprisonment without parole in the custody of the Mississippi Department of Corrections.

The relevant facts are described in more detail in the state court's opinion as follows:

> During a separation from her husband, Susan Smith[1] became
> romantically involved with Carter. In February 2004, Carter moved in with
> Susan and her children, Sally and Jonathan. Sally was seven years old when
> Carter moved in. When Carter initially moved in, he and the Smith family
> lived in an apartment. Sometime around March 2004, Carter and the Smiths
> moved into a run-down pink trailer, and then into a nicer trailer in July or
> August 2004. In January 2005, Carter and Susan stopped seeing each other.
> According to Susan, she forced Carter out of the trailer, while Carter
> maintained that it was his decision to leave.
>
> Susan testified that she noticed Sally acting oddly after Carter left
> the home. Sometime in late March or early April 2005, Susan asked Sally
> what was wrong, and Sally told Susan that Carter had touched her

---

[1] The state court used fictitious names to protect the victim's identity.

inappropriately. Susan became very distraught. She initially called the police, who told her that she needed to take Sally for a rape kit and examination. This upset Susan, who did not believe that Sally needed to have a rape kit. Susan then called her mother for advice as to what to do. Susan did not give any contact information to the police, nor did she take Sally to be examined.

On April 14, 2005, the Mississippi Department of Human Services (DHS) received an anonymous call informing them that Sally might have been abused. On April 15, 2005, around 8:30 a.m., Kim Weathers, a DHS social worker, went to Sally's school and spoke with her in private. During the brief interview, Sally informed Weathers that Carter had touched her several times, including at least one time when he penetrated her vagina with his fingers. Thereafter, Weathers placed a note on Susan's door, asking her to contact DHS. When Susan received the note, she contacted DHS, and DHS made an appointment for Sally with the Children's Advocacy Center (CAC).

On April 18, 2005, Sally met with Stovall, a forensic interviewer with the CAC. The interview was videotaped and shown to the jury at trial. Although she was not particularly talkative, Sally indicated during the interview that Carter had touched her inappropriately multiple times. She indicated that the inappropriate touching had happened in a reclining chair. Sally told Stovall that Carter had penetrated her vagina with his fingers at least once, and that it had hurt. Sally specifically told Stovall about abuse that occurred while her family lived with Carter in the pink trailer. When asked where her mother was during the abuse, Sally indicated that she was either in her room or cooking nearby. Sally explained that Carter would use a blanket or other object to conceal his actions. Sally explained that she knew she was seven years old at the time of the assault because she had turned eight while they lived in the pink trailer.

After her interview with Stovall, Susan took Sally to be examined by a nurse practitioner. However, the attempted examination was very distressing to Sally, and Susan left with Sally before the nurse had a chance to fully examine Sally. Susan testified that she then took Sally back to the CAC, where someone recommended that Susan take Sally to her general practitioner. Sometime thereafter, Susan made an appointment for Sally with their general practitioner, where a nurse did a cursory examination of Sally. The nurse recommended that Susan make an appointment for Sally with a gynecologist so that a complete examination could be done. On May 10, 2005, Sally was put under general anesthesia for a full examination by Dr. Leigh Cher Gray, a gynecologist. Dr. Gray found that Sally's hymenal ring was stretched significantly and that such stretching was consistent with digital penetration.

Law enforcement was contacted at some point, and Officer Davis Haygood of the Pike County Sheriff's Department investigated the case. As part of his investigation, Officer Haygood spoke with Carter twice. Both times, Carter maintained that he had never molested Sally. Carter indicated that the only time he had done anything out of the ordinary was when he had put medicine on Sally for some sort of vaginal infection. Sally

confirmed that she had had medicine for such an infection, but the evidence was clear that Sally was capable of applying the medication herself and that Carter was never allowed to do so.

Multiple individuals testified on behalf of the State at trial. Sally and Susan both testified, as did Weathers and Stovall. Dr. Dixon, an expert in forensic interviewing and child abuse, testified as well. Officer Haygood, Dr. Gray, and Karen Touchstone, the nurse who saw Sally at her general practitioner's office, all testified. In addition, Thomas Gonsalves, a counselor who saw Sally from the time that the allegations arose until trial, testified about his therapy sessions with Sally. Sally's testimony was roughly the same as what she told Stovall, except that she indicated at trial that Carter had touched her when he lived with them in the apartment, the pink trailer, and the nicer trailer. The videotape of Sally's interview with Stovall was also played for the jury.

*Carter v. State*, 996 So. 2d 112,114-15 (Miss. App. 2008), *reh'g denied*, October 28,

2008, *cert. denied*, Dec. 12, 2008.  Carter was convicted of sexual battery and sentenced

to life in prison.

Aggrieved, Carter appealed and asserted as grounds for relief the same substantive

issues raised in the instant petition:

| | |
|---|---|
| Ground One: | Expert Witness Qualification: Two of the state's witnesses were qualified as experts in the field of forensic interviewing even though their testimony was contradictory and conflicting as to industry standards and inconsistent with MS Rules of Evidence in application of their methodologies. |
| Ground Two: | Abuse of Tender Years Exception:  I feel there was plain-error prejudicial misuse of the tender years exception in this case in that the jury was subjected to the unnecessary repetition of the allegations a total of ten (10) times. |
| Ground Three: | Coaching the Witness: Defense was prejudiced by the State's coaching of the witness in open court. |
| Ground Four: | Cumulative Evidentiary Errors:  Several of the trial court's rulings were prejudicial to the defense. |
| Ground Five: | Sentencing Disproportionate: Sentenced imposed was not proportionate to comparative cases tried in this circuit court, other Mississippi Circuit Courts, or comparative to particular federal cases. |

After thoroughly considering each of these issues on the merits, the Mississippi Court of Appeals affirmed Petitioner's conviction in a written opinion, and denied his request for rehearing. *Id.* A writ of certiorari was subsequently denied by the Mississippi Supreme Court on December 12, 2008. Carter now seeks federal habeas corpus relief under 28 U.S.C. § 2254.

## Standard of Review

This Court's review of Petitioner's claims for federal habeas relief is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996. Under the Act, this Court cannot grant a petitioner federal habeas corpus relief for any claim that was adjudicated on the merits in a state court proceeding, unless the adjudication:

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Under 28 U.S.C. § 2254(d)(1), this court reviews questions of law as well as mixed questions of law and fact, while questions of fact are reviewed under 28 U.S.C. § 2254(d)(2).

Under the first prong, the clauses "contrary to" and "unreasonable application of" are independent bases for granting federal habeas relief. *Williams v. Taylor*, 529 U.S.

362, 405 (2000). A state court's decision is "contrary to" federal law if it contradicts Supreme Court precedent or reaches a different result on materially indistinguishable facts. *Id.* Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court "correctly identifies the governing legal principle" but then "unreasonably applies it to the facts of the particular case." *Bell v. Cone*, 535 U.S. 685 694 (2002). The state court's decision must be objectively unreasonable, not merely erroneous or incorrect. *Rompilla v. Beard*, 545 U.S. 374, 380 (2005).

AEDPA's second prong requires that federal courts defer to a state court's factual determinations unless they are based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Deference is critical because federal courts have no authority to grant habeas corpus relief simply because "we conclude, in our independent judgment, that a state supreme court's application of [federal] law is erroneous or incorrect." *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002). Thus, we presume the state court's determination of a factual issue is correct, unless a petitioner rebuts the presumption with clear and convincing evidence. *See* 28 U.S. C. § 2254 (e)(1).

## Discussion

In ground one, Carter alleges that the trial court erred in admitting the expert testimonies of forensic interviewer and child abuse expert, Dr. Catherine Dixon, and forensic interviewer, Keith Stovall, with the Child Advocacy Center, both of whom

5

testified that the victim's statements were consistent with child abuse. Although he makes no supporting arguments in his habeas petition, Carter argued on direct appeal that their testimonies were erroneously admitted for two primary reasons: (1) their testimonies were contrary to industry standards and (2) their methodologies were inconsistent. On direct review, the state court rejected his claim, finding that their testimonies were properly admitted pursuant to *Daubert v. Dow Pharmaceuticals,* 509 U.S. 579, 593-95 (1993).

As an initial matter, state evidentiary rulings do not warrant federal habeas relief unless they violate a specific constitutional right or render the trial so fundamentally unfair as to violate due process. *Johnson v. Puckett*, 176 F.3d 809, 820 (5th Cir. 1999). Thus, our standard of habeas review "is not whether the testimony satisfied the *Daubert* test, which does not set forth a constitutional rule on the admissibility of scientific evidence, but rather whether the wrongful admission of evidence rendered the trial fundamentally unfair." *Schmidt v. Hubert*, No.05-2168, 2008 WL 4491467, *14. (W.D. La. Oct. 6, 2008) (citations omitted). A trial is rendered fundamentally unfair only if evidence erroneously admitted played a "crucial, critical, and highly significant role in the trial. . . ." *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir.1998) (citing *Andrade v. McCotter*, 805 F.2d 1190, 1193 (5th Cir.1986)).

In assessing this claim, the Mississippi Court of Appeals cited *Daubert's* four factors for determining the reliability of expert testimony: (1) whether the theory or

technique can be or has been tested; (2) whether the theory or technique has been

subjected to peer review or publication, (3) the known or potential rate of error, and (4)

general acceptance within the relevant scientific community. *Daubert,* 509 U.S. at 593-95.

Of these four factors, Carter primarily charged that the expert testimonies did not satisfy

*Daubert's* testability factor. But as expressly acknowledged by the state court of appeal,

the U.S. Supreme Court has also held that *Daubert's* factors are flexible and that a trial

court has broad latitude in deciding how to test an expert's reliability. *Kumho Tire Co.*

*Carmichael*, 526 U.S. 137,152-23 (1999). Relying on *Daubert*, *Kumho Tire*, and state

court precedent, the court rejected Carter's claim that the experts' testimonies were

inconsistent with industry standards. The court explained that:

> Dr. Dixon admitted that *it would be virtually impossible to test the accuracy of forensic interviewing of children claiming sexual abuse, as such testing would necessarily involve first sexually abusing a child and then observing the child's responses to questioning*. However, as *Kumho Tire* noted, not all the *Daubert* factors will be applicable in each case. Clearly, the accuracy of forensic interviewing is largely untestable, and that *Daubert* factor therefore does not apply when determining the admissibility of such an expert's testimony. We note that there is no evidence to suggest that the testimonies in question from Stovall and Dr. Dixon failed to meet any of the other factors. Further, *the procedure followed by Stovall is peer-reviewed, has general acceptance in the relevant community, and has standards that control the technique's operation.* In fact, Carter's own witness, Dr. Mooers, indicated that he had no problems with the procedure followed by the CAC.

*Carter*, 996 So. 2d at 117 (emphasis added). The court also went on to note that similar

testimony from forensic interviewing experts, including Dr. Dixon and Mr. Stovall, had

been admitted in numerous other sexual assault cases. *Id.* (citing *Lattimer v. State*, 952

So.2d 206, 221 (Miss. Ct. App. 2006) (finding "no indication that Mr. Stovall failed to

reliably apply the principles and methods of forensic interviewing to the facts of the case"); *Williams v. State*, 970 So.2d 727, 734-35 (Miss. Ct. App. 2007); *Walls v. State*, 928 So.2d 922, 929 (Miss. Ct. App. 2006); *Mooneyham v. State*, 915 So.2d 1102, 1104 (Miss. Ct. App. 2005)). For these reasons, the state court concluded that the admission of the expert testimonies was not an abuse of discretion.

Such a finding was not contrary to or an unreasonable application of federal law. The Fifth Circuit Court has recognized the "obvious limitations inherent in such research" in sexual assault cases and that "expert testimony drawing on it is not thereby proscribed by *Daubert*." *U.S. v. Simmons*, 470 F.3d 1115 (5th Cir. 2006) (citing *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1297 (8th Cir. 1997) (recognizing methodological limitations in all social-science research, particularly sexual-harassment research; nevertheless, holding such expert testimony admissible). Rather, the expert's professional experience, education, training, and observations are considered indicators of reliability. *Id.* at 1122. Carter does not dispute, and the record confirms, that these other factors were met.

Carter also asserts that the experts' "application of their methodologies" was inconsistent. Specifically, he claims they cited both the lack and presence of detail in the victim's statements as indicators of her credibility. Dr. Dixon's actual testimony was as follows:

Q.    Can you tell me what indicators you use as an interviewer to determine whether you believe a child's story is consistent with truth?

A.    There's some very specific and some very nonspecific indicators of a child's credibility and the credibility of their statement. Nonspecific factors would be the child's affect, the child's tone of voice, the child's eye contact, the child's—just their general presentation in the interview. I don't think that those factors have been scientifically tested or—you know, and they fall more into the art rather than the science of doing forensic interviewing. Other factors which influence a child's credibility obviously would be the number and quantity and quality of contextual details that the child can provide. If a child—especially a young child—can tell us what happened, where it happened, who did it, how they did it, under what circumstances they did it, how it felt, what their body felt like, where other people were in relation to them when this happened, that's a quantity of contextual detail that we know, depending on the child's developmental stage, would be very, very difficult for a child to either fabricate or carry as a story from another person. Those are factors that lend to a child's credibility.

. . . .


Q.    So whether they give few details or many details, they both may lend itself to a finding that is consistent with abuse?

A.    *And it depends on how old the child is.* A teenager who can give a detailed, contextually-rich story about child sexual abuse when that teenager has already been sexually active, has seen sexually-based content on television and in movies, that child has a basis for knowledge about the act of human sex, and that they could produce those details should be of no surprise to anyone. But when you have a prepubescent child with, unless otherwise proven, limited knowledge about human sexuality, and for them to tell an account of bodily touching to be able to describe how it felt, where it happened, who did it, you know, all of those things, it would be fairly unlikely, in my opinion, for the child to be able to fabricate all of that on their own.

. . . .


Q.    Dr. Dixon, you mentioned tentative disclosure. What are the types of disclosure, or stages, I should say?

A.    Well, in the process of disclosure, you know, like I said, a lot of children don't ever tell, some children wait a long time to tell, and then when they do tell there's a tentativeness about their disclosure. "I think this happened," or "I'm sure, but I think I forgot," or "Maybe it was this way, and maybe not," because they're anxious, they're afraid....

. . . .

Q. Dr. Dixon, what is meant by "active disclosure"?

A. That's when the child is feeling comfortable enough to tell most or all of what happened.

Q: . . . When you reviewed her videotape, did your training and experience in child sexual abuse and development allow you to form an opinion about whether or not she was in a stage of tentative or active disclosure?

A: I thought she was somewhere between tentative and active. There were some tentative elements to what she said, but at the same time she answered the questions asked of her and seemed to be motivated to give clear and correct answers. She even at times redirected or corrected [Stovall] when he asked her questions that weren't exactly how she wanted to portray information.

. . . .

Q. Mr. Stovall indicated that the interview that he conducted with [Sally] provided detailed information. *Do you agree with that?*

A. *For her developmental age, yes.*

Q. You believe that was detailed?

A. She told who did it, where it happened, how it happened, what happened, how it made her body feel. She drew a picture of the place it happened and the chair that it happened in and told where her mother was and what he covered her with. That's a lot of detail for an eight year old.

Q. Was she able to tell what she was wearing?

A. No. And, you know, that was one of those questions that I underlined in my notes that he asked her. She already told him it happened a lot of times, and then he said, "What were you wearing?" So as a child she's sitting there thinking, "Which time?" You know, so she wasn't able to say that. Because children aren't like adults. They don't come back and say, "Please clarify your question for me because I didn't understand that." They just say, "I don't know," or "I forgot." That was a typical response.[2]

(Emphasis added).

Contrary to Carter's claims, Mr. Stovall's analysis was consistent with Dr. Dixon's.

As explained on direct appeal, "at no point in his testimony did Stovall actually testify that

---

[2]ECF Nos. 16-2, pp. 42-44; 16-5, pp. 33, 35, 61.

he found the presence of details to be more consistent with the story of a sexually abused child." *Carter*, 996 So.2d at 121. He testified, rather, that when he interviewed the victim, she was in a "***tentative state of disclosure***, meaning that ... she doesn't want to talk about it, doesn't want to think about it, and doesn't want to go through it."[3] But both experts agreed that the victim gave detailed information for her developmental age. And, though she could not recall what she was wearing when the abuse occurred, both agreed that the level of details she provided was consistent with sexual abuse. As there was no indication that Dr. Dixon and Mr. Stovall failed to reliably and consistently apply the methods of forensic interviewing in this case, Carter's arguments to the contrary were found to be without merit.

For purposes of federal review, nothing in the record indicates that the admission of these expert testimonies violated a specific constitutional right or rendered his trial fundamentally unfair. Whether they were properly admitted at trial was a matter of state law. Carter is not entitled to relief on this claim.

In ground two, Carter argues that the excessive use of Mississippi's tender-years exception to admit the victim's out-of-court statements at trial subjected the jury to the "unnecessary repetition of the allegations a total of ten (10) times." The record confirms that approximately eight individuals were permitted to testify at trial regarding what the victim told them about the abuse, and that their statements were admitted pursuant to

---

[3]ECF No. 16-4, p. 135.

Mississippi's firmly rooted tender-years exception. The exception provides in relevant part that:

> A statement made by a child of tender years describing any act of sexual contact performed with or on the child by another is admissible in evidence if: (a) the court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide substantial indicia of reliability; and (b) *the child either (1) testifies at the proceedings*. . . .

M.R.E. 803 (25) (emphasis added). In rejecting this claim on direct appeal, the state court noted that Carter, who had failed to object at trial, was not challenging the reliability of any of the statements or asserting that the requirements of M.R.E. 803 (25) were not met. His sole argument was that permitting multiple individuals to testify concerning the victim's out-of-court-statements was unfairly prejudicial. The court noted that it was not unusual under state law for several witnesses to testify concerning a child's outcry statements. *Carter*, 996 So.2d at 125 (citations omitted). It explained that:

> Most of those witnesses discussed Sally's statement only as it related to the true purpose of their testimony; for example, Officer Haygood's testimony was mostly about his investigation of Sally's claim and resulting interviews with Carter. Officer Haygood discussed Sally's statement only as it related to his involvement with the case. Similarly, Dr. Gray primarily testified about her medical examination of Sally and discussed Sally's allegations against Carter only as it related to her examination of Sally.

*Id*. For these reasons, the court concluded that no manifest injustice had occurred and that this assignment of error was without merit. Habeas relief is warranted only if this finding resulted in a decision that was contrary to, or an unreasonable application of, clearly established federal law.

Carter does not assert, nor does the record demonstrate, that the admission of these statements violated a specific constitutional right. Since the victim testified at trial and was subject to cross-examination, there was no Confrontation Clause violation. *See Crawford v. Washington*, 541 U.S. 36 (2004); *Elkins v. Mississippi*, 1:07CV162 -M-D, 2008 WL 5156622 (N.D. Miss. 2008) (*Crawford* does not apply when a declarant appears and testifies at trial); *Hobgood v. Epps*, No. 3:08CV24 HTW-LRA, 2011 WL 1297063 (S.D. Miss. Mar. 31, 2011). Nor was there a due process violation. *Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992) (quoting *Lisenba v. California*, 314 U.S.219, 228 (1941)) (evidentiary errors "rise to constitutional dimension only if they so infused the trial with unfairness as to deny due process of law"). Carter was allowed to confront each witness on cross-examination, including those who testified concerning the victim's out-of court statements. No habeas relief is warranted on this claim.

In ground three, Carter argues that the prosecutor improperly coached the victim's testimony at trial. Specifically, he alleges that the prosecutor's instructions to look closely at Carter rendered her in-court identification of him suggestive and unfairly prejudicial. To warrant habeas relief, Carter must show that the prosecutor's actions were a "crucial, critical, highly significant factor in the jury's determination of guilt," resulting in a fundamentally unfair trial and denial of due process. *Tucker v. Day*, 969 F.2d 155, 157 (5th Cir. 1992) (quoting *Whittington v. Estelle*, 704 F.2d 1148, 1422 (5th Cir. 1983)). The Court finds nothing improper here.

The record reflects that the victim had difficulty recognizing petitioner in open court. She was nine years old at the time, and Carter, whom she had not seen in two years, had cut his long hair and was wearing a miliary-style haircut. He had also cut his mustache and goatee and was wearing a suit, which was unusual. On direct examination, the prosecutor stood behind each of the individuals at the defense table. Just as he had done with one of the defense attorneys, when he stood behind Carter, the prosecutor instructed the victim to "look at him real good." The victim then positively identified Carter as her abuser and explained that she had difficulty recognizing him because his hair was styled differently.[4]

The victim in this case also repeatedly identified Carter as the one who sexually abused her prior to trial. "Where, as here, an identification is based on prior acquaintance, the issue is less one of *reliability* than of *credibility*, and doubts as to credibility are properly left to the jury." *Williams v. Cain*, 2009 WL 1269282 (E.D. La. May 7, 2009) (emphasis added)(citing *United States v. Lewis*, 248 F.3d 1142 (5th Cir. 2001); *United States v. Fernandez-Rogue*, 703 F.2d 808, 814 (5th Cir. 1983)). No habeas relief is warranted on this claim.

Even if the Court were to find that the prosecutor's actions were improper, Carter has not shown that they were a "crucial, critical, highly significant factor in the jury's determination of guilt." *Id*. He has never denied that he is the Bryant Carter who lived

---

[4]ECF No. 16-5, pp. 12-13.

with the child and her family, and was the person she accused of touching her.  Carter's defense was not mistaken identity, but that he never committed the acts alleged.  As identity is not in dispute, this clam has no merit.

In ground four, Petitioner asserts that "cumulative evidentiary errors" made at trial were prejudicial to his defense.  Although he does not identify any specific errors in support, his appellate brief reflects challenges to three evidentiary rulings not previously discussed herein: (1) the limitation of Mr. Stovall's cross-examination regarding whether a jury had ever disagreed with his opinions; (2) permitting the victim's mother to testify about her own childhood abuse; and, (3) the limitation of his own testimony as to why he had cut his hair.  As to each of these rulings, the Mississippi Court of Appeals found the alleged errors were either cured when the defense was permitted to rephrase the question, or were harmless in light of the overwhelming evidence presented at trial.

Carter presents nothing in his habeas petition to overcome the deference that we must afford the state court's determination.  Nor does he demonstrate that these rulings had a "substantial and injurious effect in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 456 (1946)).  The record reflects that Mr. Stovall was ultimately permitted to explain why a jury may have disagreed with his expert opinions in the past, and Carter was also able to explain that he had cut his hair for a prospective job interview.  And, although the mother's testimony concerning her own abuse was irrelevant, the record reflects that it was

brief.[5]  Further, it is well-settled that a cumulative-error claim entitles a petitioner to

habeas relief only where "(1) the individual errors involved matters of constitutional

dimensions rather than mere violation of state law; (2) the errors were not procedurally

defaulted for habeas purposes; and (3) the errors 'so infected the entire trial that the

resulting conviction violates due process.'"  *Derden v. McNeel,* 978 F.2d at 1454  (quoting

*Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  Meritless claims cannot be cumulated

regardless of the total number raised.  *Id.*  Neither these claims, nor the other evidentiary

claims raised herein, individually, or in combination, amount to a violation of due process.

Lastly, Carter asserts in ground five that he is entitled to habeas relief because his

sentence is grossly disproportionate to his crime in violation of the Eighth Amendment.

This claim was considered and rejected by the Mississippi Court of Appeals on its merits.

In doing so, the court principally relied on the three-part test set forth by the U.S. Supreme

Court in *Solem v. Helm*, 463 U.S. 277 (1983), which instructs lower courts to consider:

(1) the "gravity of the offense and the harshness of the penalty;" (2) the "sentences

imposed on other criminals in the same jurisdiction;" and (3) the "sentences imposed for

commission of the same crime in other jurisdictions."  *Id.* at 291-92.

Applying the *Solem* factors, the court noted that Carter's sentence was within the

statutory guidelines of Miss. Code Ann. § 97-3-101(3) (Rev. 2006), which permits a

---

[5]ECF Nos. 16-4, pp. 52- 53; 125; 16-5, p. 134.

maximum life sentence for the sexual abuse of a minor.[6]  The court also noted that "sexual

battery of a child less than ten years old is a serious offense that, understandably, warrants

harsh penalty." *Carter*, 996 So. 2d at 129.  It further observed that while Carter had cited

cases in which similarly-situated defendants had received more lenient sentences, he had

failed to properly preserve the issue for appellate review by presenting it to the lower

court.  But even if his comparative sentencing argument had been properly preserved, the

court found that each of the cases Carter cited on appeal was distinguishable because the

defendants had either pled guilty or were convicted of a lesser offense.[7]  The court

acknowledged that there are cases where defendants have been sentenced to less than life

for the crime of sexual battery or other similar crimes, but there are also cases where life

---

[6]Carter also asserted that he would have received a lesser sentence had he been indicted
under federal law or sentenced pursuant to federal sentencing guidelines.  But as noted by the
state court of appeals, had he been indicted federally, 18 U.S.C. § 2241(c) (2006) imposes  a
maximum life sentence for individuals convicted of aggravated sexual abuse of a minor under
the age of 12.  Moreover, the state court was not required to consider federal sentencing
guidelines in its proportionality analysis. *Cowherd v. Million*, 260 F.App'x 781, 786 (6th Cir.
2008)("The Supreme Court has not . . . ever suggested that state sentences and federal sentences
must approximate each other in order to pass constitutional muster.").

[7]*Carter,* 996 So.2d at 130 (citing *Dawkins v. State*, 919 So.2d 92, 94 (Miss. Ct. App.
2005) (defendant sentenced pursuant to a guilty plea to 20 years, with 10 years suspended, for
capital rape of his 10 year-old daughter); *Caldwell v. State*, 953 So.2d 266, 267 (Miss. Ct. App.
2007) (defendant sentenced pursuant to a guilty plea to 35 years, with 18 years suspended and 5
years of post supervised release, for one-count of sexual battery); (*Hodgin v. State*, 964 So.2d
492 (Miss. 2007) (defendant sentenced to two 20-year consecutive terms for fondling and sexual
battery for a total of 40 years)*; Penny v. State*, 960 So.2d 533, 536 (Miss. Ct. App. 2006)
(defendant convicted of a lesser offense of fondling)).

sentences have been imposed and affirmed for such crimes." *Carter*, 996 So. 2d at 132.[8]

Based on *Solem*, the court concluded that Carter's life sentence was not grossly

disproportionate to his crime.

This determination is not objectively unreasonable or in conflict with clearly

established federal law. Since *Solem*, the United States Supreme Court has observed that

"our precedents in this area have not been a model of clarity" and that "we have not

established a clear or consistent path for courts to follow." *Lockyer v. Andrade*, 538 U.S.

63,72 (2003). The Court has acknowledged that "the only relevant clearly established law

amenable to the 'contrary to' or 'unreasonable application of' framework is the gross

disproportionality principle, the precise contours of which are unclear, applicable only in

the 'exceedingly rare' and 'extreme case.'" *Id*. at 73.

Given this "'uncertainty' among our country's highest jurists," the Mississippi

Court of Appeals was not objectively unreasonable in affirming Petitioner's sentence.

*Tate v. Kelly*, No. 4:08CV9, 2011 WL 1103769 *3 (S.D. Miss. March 23, 2011); *Miles v.

Bradley*, No. 2:04 CV349, 2007 WL 1223557 (N.D. Miss. Apr. 25, 2007) (law of gross

---

[8] *Id.* (citing *Hobgood v. State*, 926 So.2d, 847 856-57 (Miss. 2006) (defendant sentenced to life in custody for sexual battery of girlfriend's five-year-old son); *Renfrow v. State*, 882 So.2d 800, 802 (Miss. Ct. App. 2004) (defendant sentenced to life in custody for sexual battery of his girlfriend's three-year old daughter); *Gilmore v. State*, 872 So.2d 744, 746 (Miss. Ct. App. 2004) (defendant sentenced to consecutive life sentences without parole for the murder and sexual battery of his girlfriend's two-year-old daughter); *Sanderson v. State*, 872 So.2d 735, 736 (Miss. Ct. App. 2004) (defendant sentenced to consecutive terms of life imprisonment and twenty years for the sexual battery and statutory rape of a ten-year-old girl)).

proportionality not clearly established, thus Mississippi state courts did not unreasonably apply clearly established federal law in sentencing petitioner as a habitual offender to life without parole for forgery).[9] Carter's sentence was within statutory limits and consistent with state court precedent. *Long v. Sparkman,* No. 3:11CV29, 2011 WL 4386387 (N.D. Miss. Sept. 20, 2011) ("Habeas corpus relief is proper only if a petitioner is able to show that the sentence imposed 'exceeds or is outside the statutory limits, or is wholly unauthorized by law.'") (quoting *Haynes v. Butler*, 825 F.2d 921, 923 (5th Cir. 1987)). The jury heard detailed testimony from the victim describing the sexual abuse she experienced on multiple occasions and she identified Carter as her abuser. Two forensic experts concurred that her story was consistent with sexual assault and her examining gynecologist confirmed that her injuries were consistent with digital penetration. Based on the evidence, Carter was convicted and sentenced to life without parole. He has failed to show that his sentence was exceedingly rare or extreme in violation of the Eighth Amendment.

For the reasons discussed herein, the undersigned recommends that the Petition for Writ of Habeas Corpus be dismissed with prejudice.

---

[9]*See also Baskin v. Scott*, No. 3:09CV551, 2012 WL 5947584 (S.D. Miss. Nov. 28, 2012) (adopting report and recommendation of *Baskin v. Scott*, No.3:09CV551, 2012 WL 5947647 (S.D. Miss. June 25, 2012 )).

**NOTICE OF RIGHT TO APPEAL/OBJECT**

Pursuant to Rule 72(a)(3) of the *Local Uniform Civil Rules of the United States District Courts for the Northern District of Mississippi and the Southern District of Mississippi*, any party within 14 days after being served with a copy of this Report and Recommendation, may serve and file written objections. The objections must be filed with the Clerk of Court, served upon the other parties, and submitted to the assigned District Judge. The objecting party must specifically identify the findings, conclusions, and recommendations to which he objects. Within 7 days of the service of the objection, the opposing party must either serve and file a response or notify the District Judge that he or she does not intend to respond to the objection.

The parties are hereby notified that failure to file timely written objections to the proposed findings, conclusions, and recommendations contained within this report and recommendation, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. 28 U.S.C. § 636, Fed. R. Civ. P. 72(b) (as amended, effective December 1, 2009); *Douglas v. United Services Automobile Association*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

This the 6th day of February 2013.

/s/ Linda R. Anderson
UNITED STATES MAGISTRATE JUDGE